# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JILL M. WOLFGRAM**
        **Plaintiff,**

    **v.**                              **Case No. 18-C-1678**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff Jill Wolfgram applied for social security disability benefits claiming that she could no longer work due to shoulder and mental impairments. The Administrative Law Judge ("ALJ") assigned to the case found a severe impairment of the right shoulder, but not the left, and that the medical evidence did establish the existence of a mental impairment. He then concluded, based on a review of the medical opinions and plaintiff's statements, that plaintiff remained capable of light work with no climbing or overhead reaching on the right. A vocational expert ("VE") opined that a person so limited could still perform a significant number of jobs in the economy, and the ALJ denied the application based on that testimony. Plaintiff sought review by the agency's Appeals Council ("AC"), submitting additional medical records discussing her left shoulder and a psychological evaluation assessing a cognitive impairment, but the AC found that this evidence did not undermine the ALJ's decision and declined review.

Plaintiff now seeks judicial review, arguing that the ALJ erred in evaluating the medical opinions, her left shoulder impairment, and her statements regarding her symptoms and limitations. She further argues that the AC erred in failing to remand the case based on new and material evidence. Finding no merit in these arguments, I affirm.

# I. FACTS AND BACKGROUND

## A.   Summary of Medical Evidence Before the ALJ

In July 2012, plaintiff injured her right shoulder while working in the housekeeping department at Aurora Healthcare.  (Tr. at 549.)  Treated with medications, therapy, and injections, she was able to return to full duty work by December 2012.  By May 2013, however, the pain in her shoulder flared up again.  (Tr. at 546.)  On exam at that time, plaintiff displayed tenderness throughout the anterior and lateral portion of the shoulder; range of motion and strength were intact, but impingement test was positive.  Assessed with right shoulder impingement and pain, she was given a prescription for Meloxicam[1] and received another injection.  (Tr. at 547.)

In July 2013, plaintiff reported that the injection helped with her symptoms but gradually wore off.  She reported pain with increased activities, especially at work. (Tr. at 549.)  On exam, sensation was intact, range of motion somewhat limited, strength 5/5, and impingement testing equivocal.  (Tr. at 549-50.)  Her medications were continued, physical therapy ordered, and she was given one week off work.  (Tr. at 550.)

In July 2013, plaintiff reported that the therapy was not helping (Tr. at 551), and a repeat MRI was ordered (Tr. at 552).  In the meantime, she was restricted to left upper extremity work only and no overhead work.  (Tr. at 552.)

On September 10, 2013, plaintiff saw Dr. Karl Scheidt (Tr. at 556), who on exam noted tenderness on palpation, positive impingement sign, and intact sensation and motor strength. The MRI showed full thickness supraspinatus tendon tear, AC joint arthrosis, and type 3

---

[1]Meloxicam (a/k/a Mobic) is a nonsteroidal anti-inflammatory drug ("NSAID"). https://www.drugs.com/meloxicam.html.

acromion. (Tr. at 558.) Plaintiff having failed conservative treatment, Dr. Scheidt recommended surgery. (Tr. at 558-59.)

Dr. Scheidt performed right rotator cuff repair surgery on September 16, 2013 (Tr. at 563, 676), and at her one month follow-up on October 17, 2013, plaintiff was noted to be doing well but stiff; the doctor recommended range of motion exercises for "frozen shoulder." (Tr. at 574-75). At her November 14, 2013, follow-up, Dr. Scheidt noted that plaintiff's progress was being limited by her loss of motion (adhesive capsulitis) so he recommended manipulation under anesthesia (Tr. at 580), which he performed on November 18, 2013 (Tr. at 585, 691).

At her November 26, 2013, follow-up, plaintiff reported continued pain and stiffness. (Tr. at 586.) On exam, she had significant pain with passive range of motion. She was instructed on home stretching exercises. (Tr. at 586.) On December 17, 2013, plaintiff stated that her shoulder was improving. (Tr. at 590.) Dr. Scheidt recommended continued therapy and exercises, and use of a lidoderm patch. (Tr. at 591.)

On January 14, 2014, plaintiff reported improving quite a bit with her range of motion, and that the lidoderm patch helped. On exam, she had significant tenderness and 4/5 rotator cuff strength on the right. (Tr. at 595.) Dr. Scheidt encouraged her to stretch and indicated she would begin returning to work on light duty. (Tr. at 596.)

On February 18, 2014, Dr. Scheidt noted near normal strength, negative impingement sign, and intact sensation and motor strength. "Doing well." (Tr. at 600.) On April 14, 2014, plaintiff reported increased pain for the last week since she increased her work day to eight hours. She stated that she did well with four and six hour days, but had trouble with eight hours. On exam, she had 5/5 rotator cuff strength. Dr. Scheidt noted: "Doing very well, has made great improvements in her ROM." (Tr. at 604.) She would cut back to six hours for one

3

month and continue home therapy exercises.  (Tr. at 604.)

On May 1, 2014, plaintiff reported pain with movement and lifting the arm, diminished ability to perform activities of daily living, and difficulty with lifting and overhead activities.  (Tr. at 608.)  On exam, she displayed normal range of motion, 5/5 strength, negative test for joint stability, and mildly positive impingement sign.  Sensation and motor strength were intact.  (Tr. at 610.)  She was to continue with physical therapy and six hour workdays.  She had been taking only Advil and was provided Meloxicam.  (Tr. at 611.)

On May 15, 2014, plaintiff saw her gynecologist, reporting a lot of stress and anxiety related to issues at home.  (Tr. at 617.)  On exam, she was alert and cooperative, with normal mood and affect.  (Tr. at 620.)  A referral was placed to behavioral health; she did not want to start medication.  (Tr. at 620.)

On June 17, 2014, plaintiff returned to Dr. Scheidt, reporting pain and discomfort with working, mostly in front of the shoulder.  (Tr. at 625.)  On exam, she displayed some tenderness but normal range of motion, 5/5 strength, and negative apprehension (stability) and impingement tests, with intact sensation and motor strength.  (Tr. at 626.)  Dr. Scheidt provided a right shoulder injection.  (Tr. at 627.)

On July 7, 2014, plaintiff reported continued pain in the right shoulder.  The injection helped briefly but had worn off.  She was frustrated by her limitations in strength and continued to have trouble with work around the house and lifting at her job.  (Tr. at 631.)  It was recommended she do additional physical therapy; if she continued to have persistent pain, an MRI may be necessary.  (Tr. at 632.)

On September 22, 2014, plaintiff saw Dr. Gerald Adler for an evaluation of her right shoulder.  (Tr. at 636.)  She had been able to return to work in March but had persistent

4

symptoms. (Tr. at 636-37.) A repeat MRI confirmed a persistent rotator cuff tear and possible frayed labral tear. (Tr. at 637, 728.)

Dr. Adler performed an arthroscopic rotator cuff revision repair on October 3, 2014. (Tr. at 639, 644, 729-36.) On October 13, 2014, plaintiff reported doing quite well following the surgery. She stated that her pain was quite well controlled at that time, using Percocet. (Tr. at 650.) On November 10, 2014, plaintiff stated she was "doing very well." (Tr. at 654.) She was to continue physical therapy. (Tr. at 654.)

On December 22, 2014, plaintiff reported improved pain in the right shoulder, not taking any pain medication anymore. She had not yet been able to return to work. She felt her motion was improving as well as her strength. She was to continue with physical therapy. (Tr. at 658.)

On January 20, 2015, plaintiff reported some mild pain in the right shoulder, but overall her pain had improved significantly from the most recent surgery, and she was happy with the progress she had made. She felt she could return to light duty and would like to return to full duty by March 1. She mentioned a concern about depression/anxiety symptoms from the multiple surgeries and wanted to be referred to someone. (Tr. at 662.) She was to return to light duty work, and it was anticipated she would return to full duty at the next visit. (Tr. at 663.)

On February 24, 2015, plaintiff stated that she continued to improve with the right shoulder. She did have persistent soreness, especially with more activity, but overall the pain was much better following the most recent surgery. She stated that since beginning physical therapy she noticed an improvement in her motion and strength. She had been working four hour days, which had been going well, but she did not feel comfortable increasing her hours at that time. (Tr. at 749.) On exam, she displayed nearly normal range of motion and strength.

(Tr. at 749-50.)  She was to continue therapy, using ice and ibuprofen for pain, and continue with current work restrictions.  (Tr. at 750.)

On April 28, 2015, plaintiff reported continued soreness in the right shoulder.  Again, she felt she was making progress with motion and strength, but she still had difficulty with endurance for shoulder activities as well as soreness after activity.  She had made progress in therapy and was discharged to a home program.  She used ibuprofen and ice for pain.  (Tr. at 758.)  On exam, she had near full motion and strength.  She was to continue with a home exercise program.  The goal was to return to full eight hour shifts, which she should be able to attain within the next three to six months.  (Tr. at 759.)[2]

On July 13, 2015, plaintiff reported increased shoulder pain over the last month or so. She felt some of her work tasks, such as mopping and placing garbage in the dumpster (which required lifting overhead), had been especially bothersome.  She had been using Meloxicam for pain.  (Tr. at 774.)  On exam, she displayed nearly normal motion and strength.  She was given a cortisone injection in the right shoulder.  It was still expected that with continued therapy and the injection she would be able to return to full work days.  (Tr. at 775.)

On November 18, 2015, Dr. Adler indicated that plaintiff had reached maximum medical improvement.  He assessed persistent low grade pain and weakness status post right shoulder surgeries and mild right shoulder arthritis.  (Tr. at 889.)  On exam, he noted a tender AC joint but normal stability, near normal motion and strength, and normal sensation.  (Tr. at 889.)  He set permanent work limitations of no overhead activities, no mopping, and four hour days.  (Tr. at 890.)

_____

[2]At her May 19, 2015, gynecological exam, no psychiatric issues were noted.  (Tr. at 762-64.)

On December 10, 2015, Aurora indicated that it could not accommodate Dr. Adler's restrictions in her current housekeeping position, but that it could accommodate them in the job of food service assistant. (Tr. at 492.) Plaintiff accepted the new job. (Tr. at 494.)

On September 28, 2016, Dr. Adler restated plaintiff's permanent work restrictions as follows: lifting, carrying, pulling, and pushing maximum of 10 pounds with her right shoulder; no overhead activities with the right shoulder; with two arms she could lift 20 pounds, but below the right shoulder. "The 4-hour work limitations are what the patient stated that she can tolerate before she gets increased symptoms." (Tr. at 879.) She had been working with these restrictions since December 2015. (Tr. at 879.)

At an October 12, 2016, follow-up, Dr. Adler noted: "The patient states she still has soreness at the distal clavicle anterior deltoid. She feels that the shoulder has been stable since the case was wrapped up last year. She would like to go back to physical therapy. She has some persistent pain and weakness." (Tr. at 891.) He again assessed persistent low grade pain and weakness status post right shoulder surgeries and mild shoulder arthritis. (Tr. at 893.) He restated the permanent work restrictions, explaining: "The patient says she cannot work longer than 4 hour workdays otherwise she gets increased symptoms." (Tr. at 894.)

On January 18, 2017, plaintiff returned to Dr. Adler for evaluation of her right shoulder. (Tr. at 894.) She stated that she still had soreness in the shoulder. Lifting caused pain, especially when she lifted a tall coffee pot, otherwise her restrictions were working well and she wanted to keep them as is. "She is developing some pain in her left shoulder over the anterior deltoid as she is compensating with the right." (Tr. at 895.) Exam of the right shoulder was stable. Exam of the left shoulder revealed positive impingement at 100 degrees. (Tr. at 897.) Dr. Adler assessed left shoulder impingement. He reiterated her restrictions, adding "No lifting

7

and emptying of tall coffee pots." (Tr. at 898.)  She continued on Mobic.  (Tr. at 898.)

## B.    Procedural History

### 1.    Plaintiff's Application and Agency Decisions

Plaintiff applied for benefits in January 2015, alleging a disability onset date of September 5, 2013.  (Tr. at 366.)  In a disability report, plaintiff indicated that she could not work due to a rotator cuff problem and depression.  She indicated that she stopped working on October 3, 2014.[3]  (Tr. at 441.)

In a function report, plaintiff wrote that her shoulder hurt really bad, and she had three surgeries on it.  (Tr. at 448.)  Asked what she did during a day, she stated watch TV and go to work.  She reported no problems with personal care.  (Tr. at 449.)  Regarding house and yard work, she wrote: "I do everything at home."  (Tr. at 450.)  She went out every day, driving or riding in a car.  She shopped in stores for food every two days, and she could pay bills and handle a savings account.  (Tr. at 451.)  She reported that her conditions affected her ability to lift, reach, complete tasks, and use her hands.  (Tr. at 453.)

In a physical activities addendum, plaintiff indicated that she stood five feet tall and weighed 100 pounds.  She left blank questions about sitting, standing, and walking tolerance, but indicated that her doctor had limited her to lifting 20 pounds.  (Tr. at 456.)

The agency denied the application initially on April 1, 2015, based on the review of Syd Foster, D.O. (Tr. at 276, 298), who concluded that plaintiff could perform light work with

---

[3]As indicated above, this was the date of plaintiff's third right shoulder surgery.  As also indicated above, plaintiff did return to work thereafter, first in the housekeeping department on light duty, before accepting a new position in the food service department in December 2015.

occasional overhead reaching with the left upper extremity (Tr. at 282-83),[4] and Jack Spear, Ph.D., who saw no medical evidence of a medically determinable mental impairment (Tr. at 281). Plaintiff requested reconsideration, submitting an additional function report, in which she largely reiterated her previous statements. (Tr. at 481-88.) She listed hobbies of watching TV and swimming. (Tr. at 485.) On October 7, 2015, the agency maintained the denial based on the review of Mina Khorshidi, M.D. (Tr. at 287, 302), who opined that plaintiff could perform light work with limited overhead reaching on the right (Tr. at 294),[5] and Frank Orosz, Ph.D., who also saw no medical evidence of a medically determinable mental impairment (Tr. at 292).

On January 25, 2016, plaintiff requested a hearing before an ALJ. (Tr. at 306.) Prior to the hearing, she submitted a June 21, 2017, vocational evaluation report completed by Ronald Nemiroff, MS. (Tr. at 529.) In completing the report, Nemiroff reviewed plaintiff's medical records, including the restrictions set by Dr. Adler, and interviewed plaintiff. (Tr. at 530-31.)

Plaintiff reported ongoing pain in her right shoulder, which she described as mild to moderate. She further reported developing pain in her left shoulder, for which she had recently received a cortisone shot. She took Meloxicam once per day and ibuprofen once per day. She lived with and depended on her boyfriend with some daily activities. She reported poor reading

---

[4]It is unclear why Dr. Foster assessed a limitation on the left (Tr. at 283), as the medical evidence he assessed pertained to the right shoulder (Tr. at 282). This was likely a mistake or oversight.

[5]In the explanation, Dr. Khorshidi indicated plaintiff was "capable of occasional overhead reaching with LUE." (Tr. at 295.) Since Dr. Khorshidi discussed only the right shoulder elsewhere in her report, I again suspect the reference to the left arm on this page was mistake. In any event, as discussed below, the ALJ did not rely on the agency consultants in assessing plaintiff's ability to use the right arm.

and math skills, which required her boyfriend to pay bills and explain legal matters to her. She also indicated she had been diagnosed with dyslexia. She stated that she drove and did some light household tasks but avoided lifting or overhead work. She reported graduating high school, where she took special education classes. She described her reading as at the second grade level. Her math skills were also poor, e.g., she could not determine if she had received the proper amount of change after making a purchase. (Tr. at 531.) She had completed a custodial training program at WCTC, which involved little classroom work and was mostly on-the-job training. Plaintiff reported working for Aurora Healthcare for 30 years, 29 in the housekeeping department, where she cleaned patient rooms, common areas, and staff lounges. Following her injury and the imposition of permanent restrictions by Dr. Adler, her employer created a part-time position for her in the food service department where she delivered patient meals and washed dishes. Nemiroff indicated that other employees working in the food service department had to be able to read the food restrictions for patients, but plaintiff required assistance from others to make up the trays as she did not comprehend the different types of meals that patients required. (Tr. at 532.)

Nemiroff stated that based on Dr. Adller's restrictions, plaintiff could not perform the full range of light duty jobs. He further opined that she had psychological and educational impairments. He concluded that, should she not be able to maintain her current position and had to re-enter the competitive labor market, she would only be able to perform sheltered workshop employment. (Tr. at 533.)

### 2. Hearing Testimony

On July 19, 2017, plaintiff appeared with counsel for her hearing before an ALJ. The ALJ also summoned a VE to testify about jobs plaintiff might be able to do. (Tr. at 210.)

At the outset of the hearing, counsel indicated that she had reviewed the file, and that the record was complete. (Tr. at 213.) Counsel further indicated that plaintiff had significant cognitive problems, as discussed in the vocational evaluation, and that her current work was basically sheltered employment where they accommodated her limitations. (Tr. at 217.) The ALJ responded that nothing in the medical evidence suggested any kind of mental limitation, and counsel replied that plaintiff would testify about; the ALJ reiterated that there must be medical evidence to support an impairment. (Tr. at 218.)

   a.   **Plaintiff**

Plaintiff testified that she was 52 years old and lived with her boyfriend. (Tr. at 221-22.) She indicated that she was left handed, stood 5 feet tall, and weighed 100 pounds. (Tr. at 221.) She currently worked 20 hours per week in the food service department at Aurora Healthcare (Tr. at 221-22), consisting of four hour shifts, five days per week (Tr. at 233). She had a driver's license and drove to work and to the store. (Tr. at 222.) She graduated from high school, in special ed classes. (Tr. at 223.) She also completed a housekeeping program at WCTC. (Tr. at 223-24.)

Plaintiff testified that from 2002 to October 2014 she worked full-time as a housekeeper/ maid. At Aurora, she cleaned patient rooms, common areas, and operating rooms. (Tr. at 225-29.) She stopped performing this work in October 2014 because she was having surgery on her right shoulder, her third procedure. She returned to light duty in January 2015, working part-time and using one arm. (Tr. at 230-31.) In November 2015, plaintiff presented Aurora with permanent restrictions, which the employer could not accommodate in her current job, so in December 2015 they moved her to the food service department, where she continued to work. (Tr. at 231.) In that job, plaintiff made up food trays, delivered them to patients, and did

11

dishes.  (Tr. at 231.)  She delivered the trays using a cart.  She was unable to use a big cart

due to her right shoulder, but she was able to deliver food at an acceptable pace using a

smaller cart.  (Tr. at 233.)  Plaintiff testified that making up the trays was not difficult, but she

did feel it in her right shoulder lifting them.  The ALJ asked if there was "anything intellectually

challenging about figuring out what food goes on what tray," and plaintiff said no.  Nor did she

have trouble finding the rooms to deliver the trays.  (Tr. at 234.)

Asked to identify her disabling conditions, plaintiff responded her "reading and spelling"

and her "right shoulder."  (Tr. at 236.)  Asked to identify the most disabling, she said her right

shoulder.  Plaintiff testified that in 2012 while working at Aurora she tore her rotator cuff lifting

a bag.  She underwent her first surgery in 2013.  (Tr. at 236.)  She had a second procedure

shortly thereafter.  (Tr. at 237.)  She returned to work in housekeeping but continued to have

problems with her shoulder, leading to a third surgery in October 2014, after which she missed

three to four months of work.  (Tr. at 238.)  Plaintiff testified the third surgery was successful;

"it bugs me a little bit but not as bad, how it was back then."  (Tr. at 239.)  She later clarified

that the surgery made her only 20% better.  (Tr. at 239-40.)  After the third surgery, she had

physical therapy, which was helpful.  (Tr. at 244-45.)  She felt stronger after the therapy but still

could not lift overhead on the right; she used her left hand for tasks like putting dishes away

on an overhead shelf.  (Tr. at 246.)

Asked if she had any other medical conditions preventing her from working, plaintiff said

no.  The ALJ prompted her, noting that she had previously mentioned her reading and writing,

and plaintiff indicated that her reading level was second grade level.  (Tr. at 247.)  However,

she testified that her reading limitations never prevented her from doing her past jobs; she did

sometimes ask for help in her current position, e.g., with measuring cups.  (Tr. at 247-48.)  She

12

testified that she did end up doing less work than others because of this; however, she did not take significantly longer, probably just a minute more, to fill her trays. (Tr. at 250.) In a four hour shift, she might ask for help once. (Tr. at 251.)

Asked how she spent her free time, plaintiff testified that she watched TV and went on her boyfriend's boat. (Tr. at 251.) They lived on a lake, with a dock. They went out on the boat every weekend. (Tr. at 252.) She did not drive the boat. (Tr. at 253.) She also went camping, sleeping in a tent. (Tr. at 254-55.) She had a smart phone but used it for calls and texts. (Tr. at 257.)

On questioning by counsel, plaintiff indicated that she was having problems with her left shoulder (Tr. at 259) and recently had a cortisone injection (Tr. at 260.) She further testified that her boyfriend helped her write checks and pay bills (Tr. at 264-65), and that she had graduated from high school at age 22 (Tr. at 266).

### b.    VE

The VE classified plaintiff's past work as cleaner, hospital, a medium level job (Tr. at 267-68), and dietary aide/food service worker, also medium (Tr. at 268-69). The ALJ then asked a hypothetical question, assuming a person of plaintiff's age and education, able to perform light work but with no reaching overhead with the right arm and no climbing of ladders ropes, or scaffolds. (Tr. at 270.) The VE testified that such a person could not perform plaintiff's past work but could do other jobs such as cashier (330,000 jobs in the national economy), cleaner, housekeeping (325,000 jobs), and photocopy machine operator (50,000 jobs). (Tr. at 271-72.) Absence from work two days per month, consistently, would be work preclusive, as would being off task greater than 5% of the time. (Tr. at 272.) Adding to the first hypothetical a limitation to reaching overhead with the left upper extremity on a frequent basis

13

would not change the answers.  (Tr. at 272-73.)  Plaintiff's counsel asked no questions.  (Tr. at 273.)

### 3.    ALJ's Decision

On January 3, 2018, the ALJ issued an unfavorable decision.  (Tr. at 147.)  Following the required five-step process, see 20 C.F.R. § 404.1520(a), the ALJ first determined that plaintiff had engaged in substantial gainful activity following the alleged onset date, specifically, from October 2015 to December 2015 and from July 2016 to December 2016.  However, there were significant periods after the alleged onset date (September 5, 2013), during which she did not engage in substantial gainful activity.  He therefore continued with the analysis, considering plaintiff's impairments throughout the period at issue.  (Tr. at 153.)

At step two, the ALJ determined that plaintiff had a severe impairment of the right shoulder, status post surgeries.  The ALJ acknowledged that plaintiff was diagnosed with a left shoulder impairment in January 2017.  (Tr. at 153, 898.)  At that time, she reported pain in her left shoulder because she was compensating for the right side.  (Tr. at 153, 895.)  On examination, she had tenderness of the posterior deltoid and positive impingement at 100 degrees, but not atrophy, no tenderness of the AC joint, and no pain with adduction.  (Tr. at 153, 897.)  She displayed some pain and weakness with strength testing, but she had normal stability and normal sensation.  (Tr. at 153, 897-98.)  "She did not undergo aggressive treatment for this condition[.]" (Tr. at 153, 898.)

> Accordingly, the evidence indicated that [plaintiff's] left shoulder impairment did not require any significant treatment, it could resolve in less than 12 months, and/or it did not cause more than minimal limitation on [plaintiff's] ability to perform basic work activities. Therefore, the undersigned considers this condition to constitute a non-severe impairment.

(Tr. at 153.)

14

The ALJ also found no severe mental impairment. While plaintiff reported stress and anxiety due to problems at home during a May 2014 gynecological exam, the provider observed that she was alert and cooperative with normal mood and affect. (Tr. at 153, 617-20.) Despite this report, the record did not show plaintiff received ongoing treatment for a mental impairment during the period at issue. Nor did the other treatment records document ongoing mental impairments. The ALJ continued:

> While [plaintiff's] testimony indicated that she had intellectual barriers, the medical evidence did not establish that she had a learning disorder or borderline intellectual functioning. Given the lack of objective medical abnormalities, the undersigned finds that [plaintiff] did not have a medically determinable mental impairment.
>
> When making this finding, the undersigned gives great weight to the opinions of the state agency psychological consultants Drs. Jack Spear and Frank Orosz who opined in 2015 that [plaintiff] did not have a medically determinable mental impairment (Exhibits 2A, 4A [Tr. at 277-86, 288-97]). These opinions are supported by the overall evidence showing that [plaintiff] made some complaints about mental health issues but the medical evidence did not establish objective medical abnormalities.

(Tr. at 153-54.)

At step three, the ALJ concluded that plaintiff's impairments did not meet or equal the criteria of a Listing. Specifically, he considered plaintiff's right shoulder impairment under Listing 1.02, finding that the record did not document abnormalities resulting in inability to perform fine and gross movements effectively. (Tr. at 154.)

Prior to step four, the ALJ determined that plaintiff had the residual functional capacity ("RFC") to perform light work, except that she could never climb ladders, ropes, or scaffolds, and she could never reach overhead with the right arm. In making this finding, the ALJ considered plaintiff's alleged symptoms and the opinion evidence. (Tr. at 154.)

Regarding the symptoms, the ALJ acknowledged the required two-step evaluation

process, under which he first had to determine whether plaintiff suffered from an underlying impairment that could reasonably be expected to produce the alleged symptoms; second, once such an impairment had been shown, the ALJ had to evaluate the intensity, persistence, and limiting effects of plaintiff's symptoms to determine the extent to which they limited her functioning. (Tr. at 154.) At this second step, if the statements were not substantiated by the objective medical evidence, the ALJ had to consider the other evidence in the record to determine if the statements limited plaintiff's ability to do work-related activities. (Tr. at 154-55.)

Plaintiff, 47 years old as of the alleged onset date, reported that she was left hand dominant and had a high school level education. (Tr. at 155, 486, 442.) She worked as a dietary aide at a hospital, with previous employment as a cleaner at the hospital. She alleged disability based primarily on a rotator cuff injury and depression (Tr. at 155, 441), asserting that her conditions affected her ability to lift, reach, complete tasks, and use her hands (Tr. at 155, 453, 486).

Plaintiff's testimony confirmed that she worked throughout the period at issue. She worked as a hospital housekeeper in the past, returning to this work on light duty after her right shoulder surgery; she currently worked 20 hours per week as a food service worker, starting in that role in 2015, shifting to this position because she could perform the duties despite her shoulder condition. (Tr. at 155, 492, 494.) Plaintiff also testified about her daily activities, including driving, watching television, and going camping. She indicated that she lived on a lake with her boyfriend and spent time on the weekends boating, although her boyfriend drove the boat. (Tr. at 155.)

The ALJ then stated:

After careful consideration of the evidence, the undersigned finds that [plaintiff's]

16

medically determinable impairments could reasonably be expected to produce the above alleged symptoms. However, [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Accordingly, these statements have been found to affect [plaintiff's] ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence.

(Tr. at 155.)

The medical evidence showed that plaintiff injured her right shoulder after lifting a heavy bag at work, reporting pain, popping, snapping, and limited function. (Tr. at 155, 673.) Imaging showed a focal full thickness supraspinatus tendon tear, AC joint arthritis, and type three acromion, and on exam she exhibited tenderness, positive impingement sign, and reduced range of motion but almost normal strength. (Tr. at 155, 675.) Plaintiff underwent surgery in September 2013 for right should rotator cuff tear, impingement, AC joint arthritis, and significant tear of the supraspinatus. (Tr. at 155, 676.) In November 2013, she underwent a procedure consisting of the manipulation of the right shoulder under anesthesia. (Tr. at 156, 691.)

Plaintiff displayed adequate function after these procedures. At an appointment in June 2014, she reported pain and discomfort in the right shoulder. (Tr. at 156, 625.) On examination, however, she exhibited almost normal range of motion, full strength, negative impingement sign, and intact sensation. (Tr. at 156, 626.) Additional testing in September 2014 revealed a persistent rotator cuff tear and possible frayed labral tear (Tr. at 156, 637), and plaintiff underwent another surgery in October 2014. (Tr. at 156, 734.) Thereafter, plaintiff reported some pain and weakness in the right upper extremity, but she felt the shoulder had been stable. (Tr. at 156, 891.) Treatment records indicated that she continued to display adequate function. In January 2015, plaintiff reported that her pain had significantly improved and she was happy with her progress after surgery. (Tr. at 156, 745.) As of April 2015, she

17

had soreness and difficulty with endurance activities but felt she was making progress; at that time, she had almost full strength and intact sensation. (Tr. at 156, 758-59.) An examination in November 2015 showed normal sensation, some weakness in the right upper extremity, symmetric range of motion in the shoulders, and slight pain with elbow flexion but normal strength. Her provider believed she had persistent low-grade pain and weakness in the right upper extremity following the surgeries and mild arthritis of the right shoulder. (Tr. at 156, 889.) As of October 2016, plaintiff had some abnormalities (such as tenderness and weakness) but no atrophy, normal stability, and normal sensation. (Tr. at 156, 893.) By January 2017, she had positive impingement at 120 degrees for the right shoulder, but a stable exam overall with well-healed incisions. (Tr. at 156-57, 897.) She displayed some pain and weakness with strength testing, but she had normal stability and normal sensation. (Tr. at 157, 897-98.) Finally, the ALJ noted that after the surgeries plaintiff's right shoulder was treated conservatively with medications, a cortisone injection, and physical therapy. (Tr. at 157, 898.)

"Therefore, the medical evidence documented [plaintiff's] disorders of the right shoulder with status post surgeries. The residual functional capacity accommodates [plaintiff's] impairments by reducing her to light work except she can never climb ladders, ropes, or scaffolds and she can never reach overhead with the right upper extremity." (Tr. at 157.)

The ALJ found plaintiff's statements about her symptoms "not entirely consistent with the evidence." (Tr. at 157.) While the medical evidence showed that she clearly had disorders of the right shoulder that caused limitations, she exhibited adequate physical function both before and after the surgeries. In September 2013, she had abnormalities that would be treated with surgery but still exhibited almost normal strength. (Tr. at 157, 675.) After the initial procedures, she had pain and discomfort in June 2014 but still exhibited almost normal range

of motion, full strength, a negative impingement sign, and intact sensation. (Tr. at 157, 626.) After the most recent surgery, she reported that her pain significantly improved. (Tr. at 157, 745.) She was treated conservatively thereafter, and her strength and range of motion improved with physical therapy. (Tr. at 157, 844-47.) By January 2017, she had some irregularities of the right shoulder but a stable exam overall with well-healed incisions. (Tr. at 157, 897.)

The evidence also showed that plaintiff could perform a fair range of activities. In her most recent function report, plaintiff indicated that she had ongoing pain but could perform personal care tasks without problems, do laundry, shop in stores for food, and swim. (Tr. at 157, 481-88.) Likewise, she testified that was able to drive to work and to the store, go camping, and ride on a speedboat. In addition, she testified that she worked 20 hours per week as a food service worker. The VE classified this occupation as dietary aide, which was unskilled medium work. "While this evidence does not establish that she could perform fulltime gainful employment, it is one factor to consider when assessing [her] ability to function." (Tr at 157.)

As for the opinion evidence, the ALJ first considered the reports of the agency medical consultants. At the initial determination level in March 2015, Dr. Foster opined that plaintiff could perform light work with occasional overhead reaching with the left upper extremity. (Tr. at 158, 282-83.) Upon reconsideration in October 2015, Dr. Khorshidi opined that plaintiff could perform light work with limited overhead reaching with the right upper extremity. (Tr. at 158, 294.) However, she provided an explanation wherein she stated plaintiff was capable of occasional overhead reaching with the left upper extremity. (Tr. at 158, 295.)

The ALJ gave great weight to the consultants' opinions that plaintiff should be reduced

19

to light work, which he found appropriate given the medical evidence showing right shoulder impairment with ongoing pain and weakness, but generally adequate physical function during the period at issue. However, he gave little weight to their opinions about overhead reaching. The consultants made statements regarding plaintiff's left shoulder, but the medical evidence showed her primary problem involved the right shoulder. In any event, even if the consultants had reduced plaintiff to occasional reaching overhead with the right arm, the ALJ concluded that would not fully accommodate her ongoing symptoms. Instead, the ALJ credited Dr. Adler's restriction of no overhead reaching with the right upper extremity (Tr. at 158, 891, 898), which was supported by the medical evidence showing plaintiff underwent multiple surgeries on the right during the period at issue and had some residual pain and weakness. This restriction was also supported by plaintiff's testimony indicating she had problems with the right shoulder throughout the period at issue. (Tr. at 158.)

Dr. Adler further limited plaintiff to lifting, carrying, pulling, and pushing a maximum of 10 pounds with her right shoulder, lifting 20 pounds with both arms (below the right shoulder level), and no lifting or emptying of tall coffee pots. (Tr. at 158, 891, 898.) He also gave a restriction of working no more than four hours per day. (Tr. at 158, 879.) The ALJ gave some weight to Dr. Adler's opinion, specifically crediting his restriction of no overhead lifting. (Tr. at 158.) However, the record suggested that Dr. Adler based the limitations about coffee pots and four-hour workdays primarily on plaintiff's subjective reports about what she thought she could physically handle. (Tr. at 158-59, 879, 894-95.) Further, Dr. Adler's statements about lifting, carrying, pulling, and pushing were "somewhat deficient. Dr. Adler set forth a lifting, carrying, pulling and pushing maximum of ten pounds with the right shoulder. Yet, Dr. Adler stated that [plaintiff] could lift 20 pounds with both arms. While this statement suggested that [plaintiff]

20

could also carry, pull and push more weight if she used both upper extremities, Dr. Adler did not address this scenario." (Tr. at 159.)

The ALJ also considered the opinion of plaintiff's former provider, Dr. Scheidt, an orthopedic surgeon, who stated in a May 2014 progress note that plaintiff could work six-hour days. (Tr. at 159, 611.) "The undersigned gives little weight to this statement because it is conclusory in nature. Dr. Scheidt did not provide a thorough explanation for this limitation. Nor did Dr. Scheidt set forth a thorough assessment of [plaintiff's] ability to engage in work-related activities." (Tr. at 159.) The treatment record also contained various statements indicating plaintiff was unable to work, but the ALJ gave those statements little weight because they were associated with recovery periods following surgery. (Tr. at 159, e.g., 658.)

Finally, the ALJ considered the vocational evaluation performed by Ronald Nemiroff, who stated that plaintiff had poor reading skills, poor comprehension skills, poor math skills, and physical limitations. He further indicated that plaintiff's employer created a position for her that actually constituted a sheltered workshop, requiring other employees to assist her. Nemiroff concluded that if plaintiff could not maintain employment with her current employer then she would not be able to find suitable employment at or above the substantial gainful activity level. (Tr. at 159, 529-36.) The ALJ gave little weight to this evaluation. Plaintiff's testimony did not support the conclusion that she participated in a sheltered workshop, as she indicated that she was mostly able to perform her work duties as a dietary aide by helping to make trays of food and delivering the trays to patients. Likewise, the ALJ gave little weight to the conclusion that plaintiff would not be able to find suitable employment in another position, as the issue of whether a claimant is disabled is reserved to the Commissioner. Finally, the ALJ noted that Nemiroff is not an acceptable medical source, so any diagnoses he offered

21

were of little value.  (Tr. at 159.)

At step four, the ALJ concluded that plaintiff could not perform her past relevant work as a hospital cleaner, a medium level job.  (Tr. at 160.)  At step five, the ALJ determined that plaintiff could perform other jobs, as identified by the VE, including cashier, cleaner, and photo copying operator.  (Tr. at 160-61.)  The ALJ accordingly found plaintiff not disabled.  (Tr. at 161.)

### 4.    AC Review

Plaintiff sought review by the AC (Tr. at 362, 538-45), submitting several pieces of additional evidence: a February 28, 2018, psychological evaluation from by Michael Kozlowski, M.A., and Brad Grunert, Ph.D., assessing a "severe cognitive disability," with a full-scale IQ of 57 (Tr. at 13-17); additional medical records from Aurora Health Care dated January 2017 to January 2018 discussing plaintiff's left shoulder condition (Tr. at 19-106); an April 18, 2018, letter from Dr. Christopher Dale, indicating plaintiff underwent left shoulder surgery earlier that month; (Tr at 108); and a job description for the food service assistant position, printed on March 13, 2018 (Tr. at 110-11.)

On August 16, 2018, the AC denied plaintiff's request for review.  (Tr. at 1.)  The AC concluded that the Aurora evidence dated January 30, 2017, through January 18, 2018, and the job description from Aurora printed March 13, 2018, did "not show a reasonable probability that it would change the outcome of the decision."  (Tr. at 2.)  The AC further stated that the February 28, 2018, psychological evaluation and the April 18, 2018, letter from Dr. Dale did "not relate to the period at issue.  Therefore, it does not affect the decision about whether you were disabled beginning on or before January 3, 2018 [the date of the ALJ's decision]."  (Tr. at 2.)

Because the AC denied review, the ALJ's decision became the final word from the Commissioner on plaintiff's application. See Prater v. Saul, No. 19-2263, 2020 U.S. App. LEXIS 1352, at *6 (7th Cir. Jan. 15, 2020). This action followed.

## II. DISCUSSION

### A. Standard of Review

The court will affirm a decision on disability benefits if the ALJ applied the correct legal standards and the conclusion is supported by substantial evidence. Id. "Substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. at *6-7. The court will not, under this deferential standard, re-weigh the evidence, resolve conflicts, decide questions of credibility, or otherwise substitute its judgment for that of the ALJ. L.D.R. v. Berryhill, 920 F.3d 1146, 1152 (7th Cir. 2019). "In rendering a decision, an ALJ must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." Pepper v. Colvin, 712 F.3d 351, 362 (7th Cir. 2013) (internal quote marks omitted).

### B. Plaintiff's Arguments

Plaintiff argues that the ALJ erred in addressing the medical opinions, her left shoulder impairment, and her statements. She further argues that the AC erred in failing to grant review based on the psychological report assessing a cognitive impairment. I address each argument in turn.

#### 1. Medical Opinions

"An ALJ must consider all medical opinions in the record." Roddy v. Astrue, 705 F.3d 631, 636 (7th Cir. 2013). Under the regulation applicable to plaintiff's claim, the medical opinion

of a claimant's treating physician is entitled to "controlling weight" if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. Gerstner v. Berryhill, 879 F.3d 257, 261 (7th Cir. 2018); 20 C.F.R. § 404.1527 ("Evaluating opinion evidence for claims filed before March 27, 2017."). If the opinion does not meet the test for controlling weight, the ALJ must decide how much value it does have by considering a variety of factors, including the length, nature, and extent of the treatment relationship; the support offered by the source for the opinion; the consistency of the opinion with the record as a whole; and the physician's specialty, if any. 20 C.F.R. § 404.1527(c). The opinions of agency consultants are evaluated under these same factors, i.e., supportability, consistency, and expertise. Id.; Haynes v. Barnhart, 416 F.3d 621, 630 (7th Cir. 2005).

The ALJ must give "good reasons" for discounting the opinion of a treating source, 20 C.F.R. § 404.1527(c)(2), but this does not mean a treating physician's opinion constitutes the final word on a claimant's disability. Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007); see also Thomas v. Colvin, 745 F.3d 802, 808 (7th Cir. 2014) ("RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide."). The ALJ must base his RFC determination on the entire record and "is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians." Schmidt, 496 F.3d at 845. Further, a treating source report may contain opinions on several different issues, which the ALJ will evaluate separately. See Tenhove v. Colvin, 927 F. Supp. 2d 557, 572 (E.D. Wis. 2013). The ALJ may discount a treating physician's medical opinion if it is conclusory, inconsistent with the opinions of other physicians, or based solely on the claimant's subjective complaints, see, e.g., Loveless v. Colvin, 810 F.3d 502, 507 (7th Cir. 2016); Ketelboeter v.

24

<u>Astrue</u>, 550 F.3d 620, 625 (7th Cir. 2008), so long as he minimally articulates his rationale, <u>Elder v. Astrue</u>, 529 F.3d 408, 415 (7th Cir. 2008); <u>see also</u> <u>Stepp v. Colvin</u>, 795 F.3d 711, 718 (7th Cir. 2015) ("We uphold all but the most patently erroneous reasons for discounting a treating physician's assessment.") (internal quote marks omitted).

As discussed above, the ALJ evaluated the medical opinions of record in this case. Specifically, he credited the agency consultants' conclusion that plaintiff could perform light work but discounted their proposed limitations on overhead reaching; finding plaintiff more limited, he credited Dr. Adler's restriction of no overhead activities with the right arm. However, he discounted Dr. Adler's limitation to part-time work as based on plaintiff's subjective reports about what she thought she could do. (Tr. at 158.)

Plaintiff concedes that the ALJ was correct in identifying the basis for the four-hour limitation. (Pl.'s Br. at 8; <u>see</u> Tr. at 879: "The 4-hour work limitations are what the patient stated that she can tolerate before she gets increased symptoms."; Tr. at 894: "The patient says she cannot work longer than 4 hour workdays otherwise she gets increased symptoms.".) However, plaintiff contends that it was not improper for Dr. Adler to assess limitations based on her statements. (Pl.'s Br. at 8-9; Pl.'s Rep. Br. at 2.) In support, she relies on cases involving mental impairments, in which the Seventh Circuit noted "that opinions derived from subjective reports are not automatically suspect." <u>Thompson v. Berryhill</u>, 722 Fed. Appx. 573, 581 (7th Cir. 2018) (citing <u>Adaire v. Colvin</u>, 778 F.3d 685, 688 (7th Cir. 2015); <u>Price v. Colvin</u>, 794 F.3d 836, 839-40 (7th Cir. 2015)). This rule sensibly reflects the fact that "psychiatric assessments normally are based primarily on what the patient tells the psychiatrist," such that a contrary rule would mean "most psychiatric evidence would be totally excluded from social security disability proceedings." <u>Price</u>, 794 F.3d at 840; <u>see also</u> <u>Knapp v. Berryhill</u>, 741 Fed.

Appx. 324, 328 (7th Cir. 2018) ("By necessity, however, patients' self-reports often form the basis for psychological assessments."). Dr. Adler is not a psychiatrist, and none of the cases plaintiff cites cast doubt on the long line of Seventh Circuit authority permitting ALJs to reject medical opinions based on the claimant's subjective complaints rather than objective medical evidence. E.g., Britt v. Berryhill, 889 F.3d 422, 426 (7th Cir. 2018); Ghiselli v. Colvin, 837 F.3d 771, 776 (7th Cir. 2016); White v. Barnhart, 415 F.3d 654, 659 (7th Cir. 2005); Dixon v. Massanari, 270 F.3d 1171, 1178 (7th Cir. 2001); see also Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to [a] citation of a claimant's subjective complaints.").

Plaintiff contends that the ALJ could only speculate that Dr. Adler was trying to placate her rather than offering medical advice, and that if the ALJ did not understand the basis for this limitation he should have re-contacted the doctor for clarification. (Pl.'s Br. at 9.) However, the record contains clear evidence—quoted above—that Dr. Adler based this limitation on what plaintiff said she could do, rather than on his own independent medical judgment. See Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled."). Further, plaintiff was represented by counsel at the hearing, and counsel never asked the ALJ to re-contact Dr. Adler or otherwise supplement the record. See Summers v. Berryhill, 864 F.3d 523, 527 (7th Cir. 2017) (noting that the ALJ may presume a represented claimant has made her best case for benefits). Nor does plaintiff cite any record evidence in which Dr. Adler (or any other provider) explained why she was physically unable to handle full-time work. See Ghiselli, 837 F.3d at 777 (rejecting limitation to 4-hour shift "unaccompanied by any reference

to objective medical evidence").[6]

Plaintiff further argues that the ALJ should have given Dr. Adler's opinion more weight because of his specialty as an orthopedic surgeon. (Pl.'s Br. at 9.) The ALJ acknowledged that Dr. Adler performed surgery on plaintiff's right shoulder, and the ALJ credited his opinion regarding plaintiff's ability to use the right arm. (Tr. at 158.) Plaintiff fails to explain why Dr. Adler's speciality made him more qualified to opine on plaintiff's ability to sustain full-time work or otherwise required the ALJ to adopt his opinion in toto; nor does she explain why the ALJ's failure to explicitly discuss this regulatory factor otherwise requires remand. See Hall v. Berryhill, 906 F.3d 640, 644 (7th Cir. 2018) (holding that perfunctory and undeveloped arguments are waived). That the regulations generally give more weight to the opinions of treating specialists, as plaintiff notes (see Pl.'s Rep. Br at 2-3), does not mean the ALJ must always credit such reports. See Brown v. Bowen, 847 F.2d 342, 346 (7th Cir. 1988) ("The administrative tribunal need not spell out every step in the reasoning, if it provides enough of the steps that the full course may be discerned.").

Plaintiff next contends that the ALJ improperly gave greater weight to the opinions of the state agency consultants, non-treating, non-examining doctors with no expertise in orthopedic surgery, than to Dr. Adler. (Pl.'s Br. at 10.) But the ALJ's analysis was more nuanced. As discussed above, the ALJ accepted the consultants' conclusion that plaintiff could perform full-

---

[6]In reply, plaintiff discusses the treatment she received for her right shoulder (Pl.'s Rep. Br. at 2, 4-5), but she fails to explain how those measures support a part-time work restriction. The ALJ thoroughly discussed this treatment, agreeing with Dr. Adler that plaintiff had significant limitation in her use of the right arm. However, the ALJ also noted that plaintiff reported good pain relief after the third surgery, that she exhibited adequate physical function before and after the surgeries, and that she engaged in a variety of activities inconsistent with a claim of disabling pain. (Tr. at 156-57.)

time light work, but he credited Dr. Adler's opinion on use of the right upper extremity.  Dr. Adler's opinion included no limitations on standing and walking, and his lifting restrictions (10 pounds with the right shoulder, 20 pounds with two arms) are generally consistent with light work.  See 20 C.F.R. § 404.1567 ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing[.]").[7]  The ALJ did not reject Dr. Adler's opinion based solely on the contradictory reports of non-examining physicians, as plaintiff also suggests.  (Pl.'s Rep. Br. at 3.)  He considered the entire record, crediting the portions of Dr. Adler's opinion supported by the evidence, discounting the restrictions based solely on plaintiff's subjective reports.  And in determining RFC, the ALJ also considered the entire record, including plaintiff's conservative treatment after the third surgery, the relatively benign findings on examination, and plaintiff's daily activities.  (Tr. at 156-58.)

Plaintiff argues that the ALJ failed to explain what inconsistencies exist between Dr. Adler's opinions and the overall record.  (Pl.'s Br. at 10.)  But this argument again assumes the ALJ simply rejected Dr. Adler's opinion; he did not; he credited Dr. Adler's opinion regarding use of the right upper extremity, finding it consistent with the medical evidence and plaintiff's statements, but rejected the opinion on part-time work, which was based solely on plaintiff's subjective statements about what she thought she could do.

---

[7]The ALJ noted that Dr. Adler's statements about lifting, carrying, pulling and pushing were somewhat deficient, in that they did not clearly address those abilities under the regulations.  (Tr. at 159.)  It was not unreasonable for the ALJ to rely on the consultants, who expressed their opinions under the regulatory framework, on this issue.  See 20 C.F.R. § 404.1527(c)(6) (stating that the agency will consider "the amount of understanding of our disability programs and their evidentiary requirements that a medical source has").

28

Finally, plaintiff contends that the part-time work limitation is supported Dr. Scheidt's "opinion" that plaintiff was limited to six-hour workdays. (Pl.'s Br. at 11, Tr. at 611.) In his May 1, 2014, note, Dr. Scheidt stated: "Continue 6 hour workdays." (Tr. at 611.) He did not otherwise elaborate. It is unclear whether this even constitutes a "medical opinion" under the agency's regulations. See Loveleless, 810 F.3d at 507 (statements about the claimant's "ability to work" are not medical opinions under 20 C.F.R. § 404.1527(a)). In any event, the ALJ addressed Dr. Scheidt's statement, giving it little weight because it was conclusory and unexplained. "Nor did Dr. Scheidt set forth a thorough assessment of [plaintiff's] ability to engage in work-related activities." (Tr. at 159.) These are permissible reasons for discounting a medical source statement, see, e.g., Loveless, 810 F.3d at 507 (explaining that an ALJ need not accept a doctor's conclusory statement about the claimant's ability to work, but need only weigh the doctor's assessments about the nature and severity of the claimant's impairments), and plaintiff does not argue otherwise. Plaintiff appears to suggest that the ALJ impermissibly credited the non-examining consultants over Dr. Scheidt (Pl.'s Br. at 11, citing Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003)), but the ALJ did not rely on the consultants in assessing Dr. Scheidt's statement.

### 2. Left Shoulder Impairment

At step two of the disability determination, the claimant must show that her impairment significantly limits her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The impairment must also meet the so-called "duration requirement," i.e., it must have lasted or must be expected to last for a continuous period of at least 12 months. 20 C.F.R. § 404.1509; 20 C.F.R. § 404.1520(a)(4)(ii).

In the present case, the ALJ found that plaintiff had a severe impairment of the right

shoulder but not the left. He acknowledged that she was diagnosed with left shoulder impingement in January 2017, but she required no significant treatment for her left shoulder, the problem could resolve in less than 12 months, and/or it did not cause more than minimal limitation on her ability to perform basic work activities. (Tr. at 153.)

Plaintiff argues that the ALJ provided no evidentiary support and instead relied on speculation in stating that the impingement could resolve in less than 12 months. (Pl.'s Br. at 11-12.) However, the claimant bears the burden of supplying adequate records and evidence to prove a claim of disability, Scheck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004); assuming without evidence that an impairment limits the ability to work would itself be speculative. Moore v. Astrue, 851 F. Supp. 2d 1131, 1146 (N.D. Ill. 2012). Plaintiff similarly faults the ALJ for not speaking more definitively about her left shoulder impairment. (Pl.'s Br. at 13, Tr. at 153: "it could resolve in less than 12 months, and/or it did not cause more than minimal limitation"), but it was plaintiff's failure to present evidence that caused the ALJ to hedge.

Tacitly acknowledging the absence of medical evidence in the record before the ALJ, plaintiff primarily relies on the treatment notes she submitted to the AC to show that the impairment was durational and severe.[8] (Pl.'s Br. at 12.) However, it has long been the rule

_____

[8]In reply, plaintiff asserts that the medical evidence before the ALJ was sufficient to prove a severe impairment. (Pl.'s Rep. Br. at 5, Tr. at 897-98.) The ALJ specifically considered this evidence, finding it insufficient (Tr. at 153), and plaintiff develops no argument that he erred in this regard. Plaintiff also attempts to argue that her hearing testimony sufficed to show a severe impairment. (Pl.'s Br. at 12; Pl.'s Rep. Br. at 5.) Impairments should be established by medical findings consisting of signs, symptoms, and laboratory findings, not just by the claimant's statement of symptoms. E.g., Edwards v. Sullivan, 985 F.2d 334, 337 (7th Cir. 1993). In any event, plaintiff fails to show that her testimony establishes a severe left shoulder impairment. The ALJ asked plaintiff to identify the medical conditions that impacted her ability to work, and she responded her "reading and spelling" and her "right shoulder" (Tr. at 235-36); he specifically asked if any other medical conditions impacted her ability to work, and she said no (Tr. at 251.) Later, on questioning by counsel, plaintiff briefly mentioned "problems" with her

in this circuit that the "correctness of [the ALJ's] decision depends on the evidence that was

before him." Eads v. Sec'y of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993).

"[M]edical records submitted for the first time to the Appeals Council, though technically a part

of the administrative record, cannot be used as a basis for a finding of reversible error." Luna

v. Shalala, 22 F.3d 687, 689 (7th Cir. 1994).[9]  As the Commissioner notes, plaintiff makes no

argument that the AC erred in failing to grant review based on these medical records, thus

waiving any such argument.  (Def.'s Br. at 6.)

In reply, plaintiff acknowledges that she has not challenged the AC's denial of review

_____

left shoulder, noting that she recently received a cortisone injection.  (Tr. at 260-61).  However, she did not elaborate on those problems or otherwise allege any work-related limitations with the left arm.  Plaintiff complains that the ALJ asked no follow up questions about her left shoulder, instead determining on his own that it would resolve within the year.  (Pl.'s Rep. Br. at 5-6.)  But this improperly shifts the burden to the ALJ.  As the Seventh Circuit noted in Summers:

> It was [plaintiff's] burden, not the ALJ's, to prove that she was disabled.  The ALJ extensively questioned [plaintiff] at the hearing and gave her every opportunity to meet that burden by elaborating on the nature, frequency, and intensity of her symptoms and related functional limitations.  Moreover, because [plaintiff] was represented by counsel at the hearing, she is presumed to have made her best case before the ALJ.

864 F.3d at 527 (internal citations omitted).

[9]Plaintiff contends that restrictions in her use of both upper extremities would preclude the performance of light work.  (Pl.'s Br. at 12.)  However, she cites no medical evidence in the record before the ALJ supporting any restrictions in use of the left arm, again relying on records presented to the AC.  It is worth noting that while these records document ongoing issues with the left shoulder, they do not appear to contain specific work-related limitations; nor does the April 2018 letter from Dr. Dale.  Moreover, the VE testified that a restriction of "frequent" reaching overhead on the left would not change his answer.  (Tr at 272-73.)  Plaintiff's counsel asked the VE no questions proposing further limitations on the left.  In reply, plaintiff contends that Dr. Adler limited her to four-hour days and no overhead lifting based on her left shoulder impingement in combination with her other impairments.  (Pl.'s Rep. Br. at 6, Tr. at 898.)  The restrictions Dr. Adler listed in the January 2017 note were the same as they had been for over a year; he added nothing new based on the diagnosis of left shoulder impingement.  (Tr at 898.)

based on these records, but she contends that the value of the new evidence is to show that the ALJ's speculation was incorrect. (Pl.'s Rep. Br. at 7.) Because the ALJ "cannot be faulted for having failed to weigh evidence never presented to him," Eads, 983 F.2d at 817, this argument fails.

### 3. Plaintiff's Statements

In determining whether a claimant is disabled, the ALJ will consider all of her "symptoms, including pain, and the extent to which [those] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). SSR 16-3p sets forth a two step-test for symptom evaluation, under which the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce her alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. Id. at *9. If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities, factors that precipitate and aggravate the symptoms, and the treatment she has received for relief of the pain or other symptoms. Id. at *18-19. The court reviews an ALJ's credibility finding deferentially, reversing only if it "patently wrong." Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019). "It is only when the ALJ's determination lacks any explanation or support that [the court] will declare it to be patently wrong." Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008) (internal quote marks omitted).

In the present case, the ALJ found that plaintiff's medically determinable impairments

could reasonably be expected to produce the alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of these symptoms "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Accordingly, these statements have been found to affect [plaintiff's] ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence." (Tr. at 155.) In support of this finding, the ALJ reviewed the medical record in detail, as discussed above, noting that while plaintiff reported pain, weakness, and tenderness, she generally displayed adequate physical function; she reported significant reduction in pain following the third surgery; and she received conservative treatment thereafter. (Tr. at 155-57.) The evidence also showed that she could perform a fair range of activities, including laundry, shopping, camping, swimming, and working 20 hours per week in food service. The ALJ acknowledged that this evidence did not establish she could work full-time, but it was a factor to consider when assessing her ability to function. (Tr at 157.)

Plaintiff first argues that the ALJ applied the wrong legal standard when he found her statements "not entirely consistent" with the evidence of record. (Pl.'s Br. at 13-14, citing Minger v. Berryhill, 307 F. Supp. 3d 865, 871 (N.D. Ill. 2018).) However, plaintiff fails to acknowledge that in the very next sentence of his decision, the ALJ correctly re-stated the regulatory language. (Tr. at 155: "Accordingly, these statements have been found to affect [plaintiff's] ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence.".) In any event, the use of unhelpful boilerplate is harmless if the ALJ goes on to provide specific reasons for his finding grounded in the evidence, see, e.g., Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012), which the ALJ did here, see Schomas v. Colvin, 732 F.3d 702, 708 (7th Cir. 2013) ("The use of boilerplate is innocuous

33

when, as here, the language is followed by an explanation for rejecting the claimant's testimony.").

Plaintiff challenges the reasons provided by the ALJ, but her arguments essentially contest the manner in which the ALJ weighed the evidence.  See Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003) (holding that the court will not re-weigh evidence, resolve conflicts, or decide questions of credibility).  For instance, plaintiff argues that the medical records upon which the ALJ relied in finding "adequate physical function" actually support her allegations of disabling pain.  (Pl.'s Br. at 14, Pl.'s Rep. Br. at 8.)  But the ALJ acknowledged that plaintiff continued to report pain, that she received a variety of treatments, and that Dr. Adler ultimately imposed significant permanent restrictions.[10]  And he partially accepted plaintiff's statements in adopting an RFC for light work with no climbing or overhead reaching on the right.  That a different fact-finder could have weighed the evidence differently does not make the decision patently wrong.  See Schloesser v. Berryhill, 870 F.3d 712, 717 (7th Cir. 2017); see also Kolar v. Berryhill, 695 Fed. Appx. 161, 161-62 (7th Cir. 2017) (noting the limitations of judicial review of an ALJ's decision); Elder, 529 F.3d at 413 ("When assessing an ALJ's credibility determination, we do not, as Elder suggests, undertake a de novo review of the medical evidence that was presented to the ALJ. Instead, we merely examine whether the ALJ's determination was reasoned and supported.").

Plaintiff also accuses the ALJ of cherry picking evidence supporting his conclusion (Pl.'s

---

[10]Plaintiff claims that one of the notes says she "was yet to be cleared to return to light duty."  (Pl.'s Br. at 14, citing Tr. at 745-46.)  As the Commissioner notes (Def.'s Br. at 17-18), the record actually says: "She feels she can return to light duty work and would like to be able to return to full duty by March 1."  (Tr. at 745.)  In reply, plaintiff concedes that she misconstrued the note.  (Pl.'s Rep. Br. at 8.)

Br. at 15), but the ALJ need not "discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability." Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010). The ALJ did not run afoul of that rule here; he considered plaintiff's physical therapy and injections. (Tr. at 157.)

Plaintiff next contends that the ALJ improperly equated her daily activities with the ability to work full-time (Pl.'s Br. at 15, Pl.'s Rep. Br. at 9, citing Beardsley v. Colvin, 758 F.3d 834, 838 (7th Cir. 2014) (cautioning against such equivalence)), but the ALJ specifically said these activities did not did not establish she could work full-time but rather were one factor to consider when assessing her ability to function. (Tr. at 157.) The regulations require an ALJ to consider daily activities as part of the analysis, 20 C.F.R. § 404.1529(c)(3)(i), and the ALJ's consideration here was consistent with Seventh Circuit case-law, see Pepper, 712 F.3d at 369. Plaintiff complains that the ALJ did not explain the significance of activities like driving or riding in a boat (Pl.'s Br. at 15-16), but the Seventh Circuit does not require such specific linkage. Id. Plaintiff complains about the ALJ's reliance on her part-time work, but the Seventh Circuit has also approved reliance on this factor. See Berger v. Astrue, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that Berger was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled."). Plaintiff contends that she was able to work only because of accommodations (Pl.'s Br. at 16, Pl.'s Rep. Br. at 10), but the ALJ closely questioned plaintiff about this at the hearing, and she testified that she was able to do the job at a sufficient pace (Tr. at 233); the only possible accommodations she mentioned were using a "square cart" to transport food trays (Tr. at 233) and asking a co-worker a question once per shift (Tr. at 251). Finally, the ALJ noted the VE's classification of dietary aide as a medium job (Tr. at 157), but he never said that plaintiff worked

35

at the medium level. (See Pl.'s Br. at 17.) Rather, his point was that plaintiff's ability to perform this somewhat physically demanding work cut against her claim of disabling limitations.

### 4. AC Review

The AC will grant review if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5). "The Appeals Council will only consider additional evidence under paragraph (a)(5) of this section if you show good cause for not informing us about or submitting the evidence [at the hearing level]." 20 C.F.R. § 404.970(b). Good cause exists if the agency misled the claimant; the claimant has a physical, mental, educational, or linguistic limitation that prevented her from submitting the evidence earlier; or some other unusual, unexpected, or unavoidable circumstance beyond the claimant's control prevented her from submitting the evidence earlier. Id.

As indicated above, plaintiff submitted several pieces of additional evidence, but she bases her argument of AC error solely on the February 28, 2018, psychological evaluation assessing a cognitive impairment. (Pl.'s Br. at 17.) The AC concluded that this report "does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before January 3, 2018 [the date of the ALJ's decision]." (Tr. at 2.) Plaintiff notes her testimony that she took special education classes in school and did not graduate until age 22; this suggests that her cognitive issues did not arise during the time after the ALJ's issued his decision but before the evaluation. (Pl.'s Br. at 18.) She further contends that the report is new and material because she did not undergo the evaluation until after the hearing and it relates to her mental capabilities during the time period at issue, alluded

to her in testimony.  (Pl.'s Br. at 18-19.)  Finally, she argues that the report supports presumptive disability under Listing 12.05A, intellectual disorder.  (Pl.'s Br. at 19.)

Plaintiff fails to address the limits on a court's ability to review an AC denial.  Ordinarily, when the AC denies review, the court evaluates the ALJ's decision as the final word of the Commissioner.  E.g., Jozefyk v. Berryhill, 923 F.3d 492, 496 (7th Cir. 2019).  If, however, the Council denies review despite the submission of additional evidence, a claimant may be able to obtain judicial review of the denial if the AC committed an error of law.  See Stepp, 795 F.3d at 722.  The Seventh Circuit has indicated that if the AC determines that the additional evidence is not "new and material," i.e., "non-qualifying" under the regulation, the court retains jurisdiction to review that conclusion for legal error.  Id. (citing Farrell v. Astrue, 692 F.3d 767, 771 (7th Cir. 2012)).  If, on the other hand, the AC deems the evidence new, material, and time-relevant but then denies review in the exercise of discretion, that decision is unreviewable.  Id. (citing Perkins v. Chater, 107 F.3d 1290, 1294 (7th Cir. 1997)).

As the Commissioner notes, plaintiff does not in her main brief specify how the AC committed an error of law in its assessment here.  (Def.'s Br. at 22.)  In reply, plaintiff argues: "The legal error is that the Appeals Council did not follow the assessment laid out in 20 C.F.R. § 404.970."  (Pl.'s Rep. Br. at 12.)  However, she does not elaborate on how the AC violated the regulation, and the court will not construct the argument for her.  See Carter v. Astrue, 413 Fed. Appx. 899, 906 (7th Cir. 2011) ("[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver.") (quoting Gross v. Town of Cicero, III., 619 F.3d 697, 704 (7th Cir. 2010)).

Further, as the Commissioner also notes, plaintiff offers no explanation why she could not have consulted with an expert on her intellectual functioning while the case was before the

ALJ. (Def.'s Brf. at 22.) The ALJ told plaintiff's counsel at the hearing that the record contained no medical evidence of mental impairment (Tr. at 218), yet she waited until after the ALJ issued his decision to obtain a report.

Plaintiff replies that the evaluation was not performed prior to the ALJ's decision, and therefore did not exist at the time, constituting a reason beyond her control that prevented her from submitting the evidence earlier. (Pl.'s Rep. Br. at 13.) This confuses the requirement that the evidence be <u>new</u>, <u>see</u> <u>Perkins</u>, 107 F.3d at 1296 (explaining that evidence is "new" if it was not in existence or available to the claimant at the time of the administrative proceeding), with the requirement that the claimant show <u>good cause</u> for not submitting it earlier. <u>See</u> 20 C.F.R. § 404.970(b)(3) (explaining that good cause includes "[s]ome other unusual, unexpected, or unavoidable circumstance beyond your control [that] prevented you from informing us about or submitting the evidence earlier"). Nothing <u>prevented</u> plaintiff from having this evaluation done prior to the hearing. <u>See</u> <u>Anderson v. Bowen</u>, 868 F.2d 921, 928 (7th Cir. 1989) ("Where, as here, the reasons for pursuing additional evidence are apparent while the case is still subject to administrative review, and there is no impediment to obtaining the evidence, no good cause has been demonstrated for failing to bring the evidence to the [ALJ's] attention."); <u>see also</u> <u>Campbell v. Shalala</u>, 988 F.2d 741, 745 n.2. (7th Cir. 1993) ("Even if he had not waived the argument, however, we agree with the magistrate judge that Campbell could and should have obtained the letters while the case was still subject to administrative review."). While claimants should be free to submit additional evidence to the AC, allowing them to submit reports which could have been obtained prior to the hearing attacking the basis for the ALJ's decision could "seriously undermine the regularity of the administrative process." <u>Perkins</u>, 107 F.3d at 1296; <u>see also</u> <u>Johnson v. Apfel</u>, NO. IP 99-1194-C H/G, 2000 U.S. Dist. LEXIS 7422, at *15 (S.D.

Ind. Feb. 23, 2000) ("The Seventh Circuit has found that to demonstrate good cause, newly submitted evidence must be more than a case of 'sandbagging' by a claimant who lost at the hearing and now attempts to receive another chance to obtain benefits by presenting new evidence.") (citing <u>Sears v. Bowen</u>, 840 F.2d 394, 400 (7th Cir. 1987)).

Finally, it is hard to see how this report would change the outcome of the case. Plaintiff argues that the evidence shows a totally disabling cognitive impairment, ostensibly existing since childhood, yet the record shows that plaintiff was able graduate from high school (Tr. at 223), complete a program at WCTC (Tr. at 223-24), obtain a driver's license (Tr. at 222), and consistently maintain employment as an adult (Tr. at 383-90, 442.) She testified at the hearing that she found nothing "intellectually challenging" about her current food service job (Tr. at 234), and the records submitted to the ALJ failed to corroborate any cognitive limitations. Plaintiff's contention that she is presumptively disabled from even unskilled work, despite decades of gainful employment, is untenable. <u>See</u> <u>Donahue v. Barnhart</u>, 279 F.3d 441, 444-45 (7th Cir. 2002) (expressing doubt about claim of disability based on illiteracy, given the claimant's 23 years of work), <u>overruled on other grounds</u>, <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148 (2019).

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 27th day of January, 2020.

s/ Lynn Adelman
LYNN ADELMAN
District Judge